# In the United States Court of Federal Claims

No. 22-364
(Filed:  8 August 2022*)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| HYDRAULICS INTERNATIONAL, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | Post-Award Bid Protest; Motion for |
| v. | * | Judgment on the Administrative Record; |
| | * | Best-Value Determination; Bid Protest |
| THE UNITED STATES, | * | Jurisdiction; Venue Transfer; |
| | * | Other Transaction Agreements; Motion to |
| Defendant. | * | Supplement; Motion to Dismiss. |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Howard W. Roth*, Oles, Morrison, Rinker & Baker, LLP, with whom were *Nicole E. Wolfe*, and *Jedidiah K. Blake*, all of Seattle, WA, for plaintiff.

*Galina I. Fomenkova*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Douglas K. Mickle*, Assistant Director, all of Washington, DC, *Seth B. Ritzman*, *Bruce L. Mayeaux*, and *Michael McDermott*, Contract Litigation & Intellectual Property Division, Army Legal Services Agency, for defendant.

## OPINION AND ORDER

**HOLTE, Judge.**

Plaintiff Hydraulics International, Inc. brings this post-award bid protest of an "Other Transaction Agreement" for Aviation Ground Power Unit prototypes used to service military helicopters.  Plaintiff contends the government misevaluated its whitepaper submission and, in awarding the prototype project to Sun Test System Inc. and John Bean Technologies, waived or relaxed a key solicitation requirement.  To support its waiver theory, plaintiff moves to supplement the administrative record with a declaration from the president of Hydraulics International, Inc.  The government cross-motions to dismiss plaintiff's complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims, or in the alternative, for judgment on the administrative record.  Plaintiff further moves to transfer venue if the Court finds it lacks jurisdiction.  For the following reasons, the Court:  (1)

---

\* This opinion was originally filed under seal on 29 July 2022 pursuant to the protective order in this case.  The Court provided the parties an opportunity to review this opinion for any proprietary, confidential, or other protected information and submit proposed redactions by 5 August 2022.  Plaintiff proposed redactions on 5 August 2022.  The Court accepts plaintiff's proposed redactions and reissues the order, with redacted language replaced as follows:  "[XXXXX]."

denies the government's motion to dismiss; (2) denies as moot plaintiff's motion to transfer venue; (3) denies plaintiff's motion to supplement the administrative record; (4) denies plaintiff's motion for judgment on the administrative record; (5) and grants the government's motion for judgment on the administrative record.

## I.    Factual Background

### A.    Aviation Ground Power Unit 1.1 Upgrade

This protest involves an upgrade to military helicopter Aviation Ground Power Units ("AGPU"), used for servicing Army helicopters when not in flight. Admin. R. ("AR") at 668 (Selection Memorandum), ECF No. 23. The AGPU provides an alternate source for the energy outputs of the helicopter's engine so maintenance can be performed without operating the aircraft's engine. To this end, the AGPU provides electrical, pneumatic, and hydraulic outputs. *Id.* The current unit, AGPU 1.0, does not support the Army's entire fleet of helicopters. *Id.* This prompted the army to seek an upgraded unit, AGPU 1.1, to service all models in the Army fleet. *Id.*

To ensure the AGPU 1.1 can meet the operational requirements if ultimately deployed, the Army provided a detailed specification in a Product Item Description ("PID"). AR at 207–22. Two requirements are relevant to this protest: (1) the AGPU must meet the minimum performance threshold for electrical, pneumatic, and hydraulic outputs while all three systems are operating simultaneously, AR at 207–13 (PID); and (2) the AGPU must be modular, such that one malfunctioning component can easily be replaced by another, and a malfunction in one output system does not affect the function of other components, AR at 213, 215 (PID).

### B.    The Other Transaction Agreement and Request for Enhanced Whitepapers

To accomplish the AGPU upgrade, the government selected an Other Transaction Agreement ("OTA") as the purchasing vehicle. OTAs are transactions "other than contracts, cooperative agreements, and grants" that are generally used for advanced research projects. 10 U.S.C. §§ 4021–22 (originally codified on 29 November 1989 as 10 U.S.C. § 2371). The Army determined "[t]he use of an OTA . . . is essential to promoting the success of the AGPU 1.1 project, because it allows for the use of a streamlined selection process, and permits the negotiation of program-specific terms and conditions." AR at 680 (Determination & Findings). The Army's objective in using an OTA was to avoid obstacles related to the regulation of procurements and reduce cost and risk for the overall project. *Id.* The Army first awarded an OTA to the Aviation and Missile Technology Consortium ("AMTC"), which engages industry and academia in OTA prototype projects. AR at 5832, 5836 (AMTC OTA). AMTC is managed by Advanced Technology International ("ATI"), and through the OTA, ATI manages several prototype projects. *Id.* To conduct the projects and satisfy the Army's technological needs, ATI issues "Requests for Enhanced Whitepapers" to members of the AMTC and enters further OTAs with selected contractors. *See* AR at 5829–61 (AMTC OTA).

On 11 January 2021, the ATI issued AMTC-21-01 Request for Enhanced Whitepapers ("RWP"), inviting whitepaper submissions for various projects in an accompanying Objective

Requirements Document ("ORD").  AR at 3 (RWP).  The AGPU 1.1 upgrade prototype project was in this ORD.  AR at 87–89 (ORD).  The project scope was for a "base effort" of one prototype AGPU 1.1, with an option for a second phase of ten prototypes.  *Id.* at 87–88.  The RWP contemplated awarding up to two contractors the base effort award in the third quarter of 2021.  AR at 88 (ORD).  The Army would then complete an initial phase of risk reduction testing in the first quarter of 2022.  *Id.*  Upon completion of risk reduction testing, the Army would decide whether to pursue a down-select option to one of the first phase vendors for the second phase in the second quarter of 2022.  *Id.*  The RWP provided, pursuant to the Army's OTA authority under § 2371b(f) (now § 4022(f)), "[u]pon a determination that this competitively awarded prototype project has been successfully completed, this project may result in the award of a follow-on production contract for over 150 AGPUs without the use of competitive procedures."  AR at 87 (ORD).

The RWP gave specific instructions on how bidders were to submit whitepapers and how they would be evaluated.  Bidders were to submit whitepapers through an online interface known as BIDS.  AR at 8–9 (RWP).  Upon submission of the whitepaper to the BIDs system, the submitting agent was then prompted to input basic information about their proposal such as price and schedule data.  *Id.*; Oral Arg. Tr. ("Tr.") at 81:11–16, ECF No. 37 (when asked what inputs are required when submitting a whitepaper via BIDS, government counsel stated:  "there's also questions that you answer in the system itself when you submit, and those are reflected . . . in this cover page.  [T]wo of those questions are the cost price estimate and the period of performance . . . .").  The provided inputs remained in the system for preparation of future evaluation documents such as the selection memorandum.  *See* Gov't MJAR at 29, ECF No. 28.  For instance, the selection memorandum will automatically populate a table with the information inputted into BIDS.  *Id.*  The RWP provided whitepapers would be assessed based on an "integrated assessment" of numerous factors.  AR at 11–12.

The Army evaluates whitepaper submissions and gives them one of three rankings:  excellent, acceptable, or unacceptable.  AR at 12 (RWP).  Excellent whitepapers "demonstrate[] a thorough approach that is expected to exceed project requirements and objectives.  The technical benefits outweigh the project risk (technical and schedule) for a development effort at this stage."  *Id.*  Acceptable whitepapers "demonstrate[] an adequate approach that is expected to meet project requirements and objectives.  The project risk (technical and schedule) is considered acceptable for a development effort at this stage."  *Id.*  Unacceptable whitepapers "do[] not demonstrate an approach that is expected to meet project requirements and objectives.  The path does not appear feasible, or does not provide the Government with a desired new or enhanced capability.  The project risk (technical and schedule) is considered too high for a development effort at this stage."  *Id.*

## C.      The Whitepaper Evaluations and Base Effort Award

Five bidders submitted whitepapers in response to the RWP.  AR at 291–526 (Whitepaper Submissions).  The three relevant here are:  (1) Sun Test System Inc.; (2) John Bean Technologies ("JBT"); and (3) plaintiff Hydraulics International, Inc.  Pl.'s Mot. J. on AR ("Pl.'s MJAR") at 7, ECF No. 26-1.  The Army initially reviewed the whitepapers and assigned each a rating of either excellent, acceptable, or unacceptable.  *See* AR at 527–56 (Technical

Evaluations).  The Army then compiled the initial evaluation feedback into consensus evaluations which assigned whitepapers a final rating of either excellent, acceptable, or unacceptable.  *See* AR at 557–94 (Consensus Evaluations).  Whitepapers rated as either excellent or acceptable were considered for award of the base effort.  AR at 87–89 (ORD).  The Army then selected two contractors for award of the base effort using a best-value determination.  *Id*.  A selection memorandum detailed the best-value decision rationale and awarded the base effort contracts.  AR at 667–76 (Selection Memorandum).

The Army rated Sun Test's whitepaper as "Excellent," the highest possible rating.  AR at 585 (Competitive Evaluation).  Sun Test's solution met or exceeded the government's expectations for energy outputs.  AR at 584.  Only minor changes were required from Sun Test's commercially available unit to raise it to 100% compliance with the PID, and Sun Test had a clear and logical plan for implementing those changes.  *Id*.  Despite having the highest estimated cost of any proposal, the Army considered this solution the best value because it was the most "complete solution."  AR at 670 (Selection Memorandum).  Sun Test's proposal met the schedule contemplated by the Army and would cost an estimated $10,167,548.  *Id.*

The Army rated JBT's whitepaper as "Acceptable."  AR at 582 (Competitive Evaluation).  Like Sun Test's proposal, JBT's met or exceeded all the government's requirements for energy outputs.  AR at 581.  JBT proposed modifying their commercially available unit to meet any requirements of the PID unmet by their current product.  *Id*. at 580.  Unlike Sun Test, JBT's whitepaper did not make clear what changes would be required to meet full compliance.  AR at 581.  Despite this risk, the Army considered JBT's solution "the next best technical approach and overall solution."  AR at 671 (Selection Memorandum).  JBT's proposal met the schedule proposed by the Army and would cost an estimated $6,204,374, although the Army noted it was unclear whether this includes all testing costs.  *Id.*

The Army rated plaintiff's whitepaper as "Acceptable."  AR at 588 (Competitive Evaluation).  Unlike Sun Test and JBT, plaintiff's existing commercial product did not meet the PID's requirement that minimum electrical, pneumatic, and hydraulic outputs be provided simultaneously.  AR at 586.  Plaintiff's whitepaper proposed two alternatives to address this shortcoming:  (1) the Army relaxes the simultaneous operation requirement; or (2) plaintiff redesigns its unit.  *Id*.  The Army rejected plaintiff's request to relax the simultaneous operation requirement.  *Id*. at 587.

The Army then evaluated plaintiff's proposal to redesign their unit to meet the simultaneous operation requirement.  AR at 587 (Competitive Evaluation).  Plaintiff's whitepaper warned "there will be an increased risk both technically and cost wise" if it redesigns its unit to meet the simultaneous power requirement.  AR at 434 (Plaintiff's Whitepaper).  The Army determined plaintiff could mitigate the technical risks associated with redesigning the prototype, but not the schedule risk.  AR at 587 (Competitive Evaluation).  Plaintiff's proposed timeline for the redesign would require twelve months before delivery of a compliant prototype and exceeds the timeline required by the ORD.  AR at 436 (Plaintiff's Whitepaper); AR at 88 (ORD).

Sun Test, JBT, and plaintiff all presented acceptable or better whitepapers and were considered for award of the base effort contract.  AR at 669 (Selection Memorandum).  The Army, however, did not to select plaintiff because it considered plaintiff's schedule risk and redesign risk undesirable.  AR at 672.  Instead, the Army awarded the base effort to Sun Test and JBT, as they presented the best value.  AR at 669–71, 675.  Plaintiff's whitepaper remains in the "basket" for potential related projects since it was rated "Acceptable."  AR at 669.

## II.   Procedural History

On 31 March 2022, plaintiff filed its complaint, ECF No. 1, a motion for preliminary injunction, ECF No. 4, and several exhibits, including the declaration of Bahman Seifollahi, ECF No. 1-11.  *See also* Am. Compl., ECF No. 24.  The Army agreed to voluntarily stay execution of the option to proceed with Sun Test to phase two, ECF No. 13, which the parties agreed rendered plaintiff's motion for a preliminary injunction moot.  The Court accordingly denied the motion as moot, ECF No. 19.  Plaintiff filed its MJAR on 29 April 2022, ECF No. 26.  On 13 May 2022, the government filed a cross-MJAR and motion to dismiss for lack of subject matter jurisdiction, ECF No. 28.  Plaintiff responded to the government's MJAR on 20 May 2022, and further moved the Court to supplement the AR with the Seifollahi declaration, or alternatively transfer venue if the Court lacks jurisdiction ("Pl.'s Reply"), ECF No. 30.  On 27 May 2022, the government replied in support of its motions and in opposition to plaintiff's motions ("Gov't Reply"), ECF No. 31.  Plaintiff did not file replies in support of its motions to supplement the AR or transfer venue.  *See* Tr. at 67:4–17, 69:2–8 (plaintiff's counsel explaining no reply briefs are necessary).  On 8 July 2022, the Court held oral argument, ECF No. 32.

## III.   The Government's Motion to Dismiss for Lack of Subject Matter Jurisdiction

### A.   Parties' Arguments

The government moves to dismiss plaintiff's complaint for lack of subject matter jurisdiction because it is not "in connection with a procurement or a proposed procurement," as required under 28 U.S.C. § 1491(b)(1).  Gov't MJAR at 15–19.  The government contends the Army acquired AGPU prototypes through use of OTAs, and OTAs are undisputedly not a "procurement."  *Id.* at 16–17.  Further, the government argues the OTAs are not in connection with a proposed procurement because any "follow-on production" from the OTAs is conditional and may never occur, and even if it were to occur, may still not be a "procurement."  *Id.* at 17–18.  According to the government, Congress provided OTA contracting authority to the Department of Defense ("DoD") "specifically [to] exempt[] these prototype projects" from "review by this Court."  Gov't Reply at 8.  To find otherwise would "not just defy reason, it obliterates it."  *Id.*

Plaintiff argues the Court has jurisdiction to hear this case under the Tucker Act because it is "in connection with a procurement."  Pl's Reply at 10.  Plaintiff contends the possibility of a follow-on production contract for 150 AGPUs without competition places these OTAs "in connection with a procurement."  *Id.* at 15–16.  Plaintiff otherwise agrees OTAs themselves are not procurement contracts.  *Id.* at 12.  In the event the Court finds it lacks jurisdiction, plaintiff requests the Court transfer the case to federal district court.  *Id.* at 16, 28.

**B.      Standard of Review**

"In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all uncontroverted factual allegations in the complaint, and construes them in the light most favorable to the plaintiff." *Stephens v. United States*, 884 F.3d 1151, 1155 (Fed. Cir. 2018) (quoting *Estes Exp. Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014)). "The United States, as sovereign, is immune from suit save as it consents to be sued, . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). The Court of Federal Claims has jurisdiction to the extent that Congress has consented, and no further. *Id.* at 587–88. "The party seeking to invoke the [Court of Federal Claims'] jurisdiction must establish that jurisdiction exists by a preponderance of the evidence." *Hymas v. United States*, 810 F.3d 1312, 1317 (Fed. Cir. 2016).

The Tucker Act grants the Court of Federal Claims "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). "[T]he Federal Circuit has held that '[t]he operative phrase "in connection with" is very sweeping in scope.'" *Space Expl. Techs. Corp. v. United States*, 144 Fed. Cl. 433, 439–40 (2019) (quoting *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999)). Though the Court's bid protest jurisdiction is broad, it nevertheless "is exclusively concerned with procurement solicitations and contracts." *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1245 (Fed. Cir. 2010).

**C.      The History of the Department of Defense's Other Transaction Authority**

In October 1957, the Soviet Union successfully launched Sputnik I, the first man-made object sent into space. Heidi M. Peters, Cong. Rsch. Serv., R45521, *Department of Defense Use of Other Transaction Authority: Background, Analysis, and Issues for Congress* 1 (2019). Triggering the Space Race, Congress swiftly responded with the Space Act of 1958 and the creation of a new agency, the National Aeronautics and Space Administration ("NASA"). *Id.* To allow NASA to move quickly and avoid the bureaucratic torpor of federal acquisition processes, the agency was given broad authority to "enter into and perform such contracts, leases, cooperative agreements, or *other transactions* as may be necessary" to carry out its mission. National Aeronautics and Space Act of 1958, Pub. L. No. 85-568, § 203(5), 72 Stat. 426, 430 (1958) (emphasis added). One interesting relation to the current Court of Federal Claims, during the first three years of NASA's existence, NASA was temporarily headquartered at the Tayloe House on Lafayette Square in Washington, DC. *East Side Historic Properties*, U.S. Gen. Serv. Admin. (Feb. 8, 2018), https://www.gsa.gov/real-estate/historic-preservation/explore-historic-buildings/heritage-tourism/our-capital/lafayette-square/east-side-historic-properties. The Tayloe House and adjacent Dolley Madison House were later joined and integrated into the National Courts Building, the current home of the Court of Federal Claims. *Id.*

Based on the success of the NASA model, Congress extended the ability to enter into such "other transactions" to several other agencies. Peters, *supra*, at 2. The DoD enjoys such authority which is statutorily governed by 10 U.S.C. §§ 4021–22. By reference to section 4021, section 4022(a)(1) allows the DoD to enter into OTAs to "carry out prototype projects that are directly relevant to enhancing the mission effectiveness of military personnel and the supporting platforms, systems, components, or materials proposed to be acquired or developed by the Department of Defense, or to improvement of platforms, systems, components, or materials in use by the armed forces." When pursuing such prototype projects, the statute mandates "[t]o the maximum extent practicable, competitive procedures shall be used when entering into [OTAs] to carry out the prototype projects . . . ." 10 U.S.C. § 4022(b)(2). If the initial prototype phase uses competitive procedures, a "follow-on production contract or transaction" may be awarded "without the use of competitive procedures." 10 U.S.C. § 4022(f)(2). Both sections 4021 and 4022 are silent on the Tucker Act, bid protests, judicial review, and the Court of Federal Claims.

## D.   Whether the AGPU 1.1 OTAs are in Connection with a Procurement or a Proposed Procurement

For the Court to have jurisdiction over the OTAs at issue in this bid protest, the OTAs must be "in connection with a procurement or a proposed procurement." § 1491(b)(1); *see Kinemetrics, Inc. v. United States*, 155 Fed. Cl. 777 (2021), *and MD Helicopters Inc. v. United States*, 435 F. Supp. 3d 1003 (D. Ariz. 2020) (each holding the Court of Federal Claims has jurisdiction when a disputed OTA is in connection with a procurement or proposed procurement); Tr. at 34:9–21 (government counsel agreeing with the holding of *Kinemetrics* and that this Court has jurisdiction over OTAs in connection with a procurement). As an initial matter, it is undisputed OTAs themselves are not procurements. Pl.'s Reply at 12; Gov't Reply at 1. This court has held OTAs are not procurements. *See Space Expl. Techs. Corp. v. United States*, 144 Fed. Cl. 433, 435 (2019) ("*SpaceX*") ("OT[A]s are agreements that are not procurement contracts."); *see also Kinemetrics, Inc.*, 155 Fed. Cl. 777. Thus, the Court focuses its analysis on these OTAs' connectivity to "a procurement or a proposed procurement." § 1491(b)(1).

The Tucker Act does not define "procurement" or "proposed procurement." § 1491. The Federal Circuit relies on the definition of "procurement" from 41 U.S.C. § 111 (formerly 41 U.S.C. § 403(2)) when delineating the bounds of the Court's bid protest jurisdiction. *See, e.g.*, *Distributed Sols., Inc. v. United States*, 539 F.3d 1340 (Fed. Cir. 2008); *Res. Conservation Group, LLC*, 597 F.3d 1238; *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326 (Fed. Cir. 2018). The statue states: "[t]he term 'procurement' includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." 41 U.S.C. § 111. Read together, the Federal Circuit has found that "a narrow application of section 1491(b)(1) does not comport with the [Tucker Act's] broad grant of jurisdiction over objections to the procurement process." *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (discussing § 1491(b)(1) and § 403(2) (currently § 111); citing *Res. Conservation Group, LLC*, 597 F.3d at 1244–45, and *Distributed Sols., Inc.*, 539 F.3d at 1345). By explicitly granting jurisdiction over "proposed procurements," "the statute does not require an actual procurement" occur and "contemplates the ability to protest . . . pre-procurement decisions." *Distributed Sols.,*

*Inc.*, 539 F.3d at 1346.  Therefore, if the AGPU OTAs are part of the Army's "process for determining a need for acquisition," then they are in connection with a proposed procurement and this Court has jurisdiction over plaintiff's complaint.  *AgustaWestland*, 880 F.3d at 1330 (citation omitted).

The government stresses although the RWP contemplates a follow-on production contract or transaction for 150 AGPUs, it does not guarantee it, and the Army reserves the right to pursue AGPU acquisition through non-procurement means.  Gov't MJAR at 18 ("[F]ollow-on production of any kind is explicitly not mandatory, 'any prototype project . . . *may* result in the award of a follow-on production,' and is conditional . . . ." (quoting AR at 13 (RWP))).  Since the program only "may" result in a production contract, no procurement contract currently exists, and one may never exist.  *Id*. at 17–18.  According to the government, this forecloses the possibility the OTAs in question could be "'in connection with a procurement or proposed procurement' as required for this Court's jurisdiction."  *Id.*

In *Distributed Solutions*, the Federal Circuit faced a similar issue and held § 1491(b) "does not require an actual procurement."  *Distributed Sols., Inc.*, 539 F.3d at 1346.  In that case, an agency issued a Request for Information ("RFI") related to software products for integration into a government system.  *Id.* at 1342.  "[T]he RFI specified [the requested information] would be 'for market research purposes only' and would 'not result in a contract award.'"  *Id.* According to the RFI, the government would "review the results of the vendor self-assessments and the presentations to determine the next course of action."  *Id.*  The agency received RFI responses but "decided to pursue alternative courses of action."  *Id.*  Instead, the agency tasked one of its prime contractors, who was already under contract, with "select[ing] and award[ing] subcontracts to vendors providing the necessary software."  *Id.* at 1342–43.  The prime contractor then issued an RFI of its own.  *Distributed Sols., Inc.*, 539 F.3d at 1343.  Two bidders who submitted responses to both the agency's and prime contractor's RFIs, but were not selected for award by the prime contractor, protested.  *Id.*  The Court of Federal Claims found jurisdiction lacking "because [the prime contractor] was not a purchasing agent for the government, the subcontracts awarded were not on behalf of a federal agency[,] and therefore were not subject to a bid protest."  *Id.*  This court found no federal agency procurement occurred, and the agency RFI alone did not give rise to § 1491(b) jurisdiction, so the court dismissed for lack of jurisdiction.  *Distributed Sols., Inc. v. United States*, 76 Fed. Cl. 524, 527–28 (2007), *rev'd,* 539 F.3d 1340 (Fed. Cir. 2008).

The Federal Circuit reversed, finding "the phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"  *Distributed Sols., Inc.*, 539 F.3d at 1346.  The Circuit noted the agency used its RFI to "determine the parameters of the eventual procurement of the software at issue," and the RFI responses influenced the agency's decision to not competitively procure the software.  *Id.*  It was immaterial no actual agency procurement occurred because "the statute does not require an actual procurement" and "explicitly contemplates the ability to protest these kinds of pre-procurement decisions by vesting jurisdiction in the Court of Federal Claims over 'proposed procurements.'"  *Id.*

The RWP in this case serves a similar purpose to the RFI in *Distributed Solutions*.  The current AGPU 1.0 no longer supports the Army's helicopter fleet, so the Army issued this RWP for AGPU 1.1 to "be a bridge between the legacy AGPU 1.0 and AGPU 2.0 that will support Future Vertical Lift [] platforms."  Gov't MJAR at 3 (citing AR at 207 (PID), 87 (ORD), 668 (Selection Memorandum)).  The ORD indicates "[t]he effort will evaluate the Technical Feasibility[,] Manufacturing Feasibility[,] and Military Utility" of the upgraded AGPU prototype unit.  AR at 195.  The PID states:  "The AGPU 1.1 shall provide Army Aviation maintenance with an enabler to ensure fully mission-capable aircraft are provided to commanders through reliability, maintainability, and availability, thereby increasing readiness rates."  AR at 207.  The ORD continues:  "It is anticipated that the completion of the base effort will feed decision points whereby the Government will assess the results of RRT, supporting documentation, manufacturability needs, and costs to determine whether or not to continue with the effort and exercise the Option."  AR at 197.  If the base effort is successful, the Army will down-select one vendor from the base effort and acquire up to ten more units to conduct:  "Performance Verification Testing," an "Operational Test and Evaluation," a "Logistics Demonstration, Customer and Transportation testing, Technical Manual Verification, [and] Provisioning Verification."  AR at 87–88 (ORD).  The ORD lastly states:  "Upon a determination that this competitively awarded prototype project has been successfully completed, this project may result in the award of a follow-on production contract for over 150 AGPUs without the use of competitive procedures."  AR at 87.  Per the RWP, the Army is using the whitepaper submissions and OTA prototypes to decide whether to proceed with purchasing upgraded AGPUs, like the RFI in *Distributed Solutions*.  *Id.*; *Distributed Sols., Inc.*, 539 F.3d at 1346.  The Army is also using the whitepapers and prototypes to "determine the parameters of the eventual procurement" or acquisition of new AGPUs, if the OTAs are successful.  *Distributed Sols., Inc.*, 539 F.3d at 1346; AR at 87–88 (ORD).  Indeed, every aspect of the RWP in this case is specifically tailored towards "determining" the Army's "need for property"—upgraded AGPUs.  *Distributed Sols., Inc.*, 539 F.3d at 1346; *see also Int'l Genomics Consortium v. United States*, 104 Fed. Cl. 669, 678 (2012) (following *Distributed Sols.* and holding an "RFI or other formal contracting action signif[ies] the beginning of a procurement process").

The government does not disagree the OTAs are for determining the Army's need for upgraded AGPUs.  At oral argument, the government confirmed the central OTA goal is to replace the legacy AGPUs.  Tr. at 16:15–19 (government counsel stating, "the eventual goal . . . if these prototypes work, if they meet the Army's needs, that eventually we'll be able to replace in the field a better product that better suits our needs.").  The government also conceded "[a]n OTA can lead to a prototype that the agency might eventually want to do a separate procurement for . . . ."  Tr. at 16:1–3.  The government further stated, "it's an open question as to whether a [follow-on] production contract [under § 4022(f)] means procurement contract."  Tr. at 27:6–8.  Nevertheless, the government agreed "the Army [is] contemplating its future need to acquire AGPUs" by virtue of including the possibility "of a follow-on production contract for 150 [AGPUs] without the use of competitive procedures."  Tr. at 28:4–20 (quoting AR at 87 (ORD)).  The government could not identify a substantive difference between an RFI, like that in *Distributed Solutions*, and the RWP present in this case.  Tr. at 15:10–18; *see also* Tr. at 58:15–25, 60:22–25 (government counsel stating the Court's jurisdiction "covers the procurement process of buying stuff," and "the end result [of an OTA] is [the government] buying stuff," but an OTA and "a procurement [are different] subset[s] of buying stuff").

Despite these concessions, the government adamantly contends the Army could fulfill all its AGPU needs with OTAs, and "that would be not subject to the Court of Federal Claims jurisdiction." Tr. at 31:21–25. The government believes it is "conceivable" no court could ever review an agency's OTA. Tr. at 43:4–11. According to the government, the combination of §§ 4021 and 4022, along with its interpretation of § 1491(b)(1) of the Tucker Act, impliedly demonstrates "Congress' intent . . . to strip this Court of jurisdiction." Tr. at 49:2–24.

The government's arguments do not pass muster. First, the government agrees §§ 4021 and 4022 are silent on jurisdiction; the government's position is based upon its own reading between the lines, not an express provision of law or statement from Congress. Tr. at 49:16–50:23. That is not to say OTAs do not receive some special treatment—OTAs are "generally not subject to the Federal laws and regulations limited in applicability to contracts, grants or cooperative agreements," and OTAs are "not required to comply with the Federal Acquisition Regulation (FAR) and its supplements." 32 C.F.R. § 3.2 (2003). Though some agency acquisitions receive special treatment under federal procurement laws, that does not inherently remove those acquisitions from the Tucker Act's purview. *See, e.g.*, *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 n.7, 1084 (Fed. Cir. 2001) (concluding section 1491(b)(1) provides jurisdiction over USPS procurements, notwithstanding its exemption "from all federal procurement laws not specifically enumerated in 39 U.S.C. § 410(a)"). OTAs' exemption from the FAR does not necessitate exemption from the Tucker Act. Second, two recent decisions, one from this court and one from the District of Arizona, do not align with the government's interpretation of these statutes. In *Kinemetrics, Inc. v. United States*, this court held it had bid protest jurisdiction over an OTA, so long as the OTA "had a direct effect on the award of a [procurement] contract." 155 Fed. Cl. 777, 785 (2021). This court found the OTA was not "'separate and distinct' from the decision to procure . . . because, unlike [*SpaceX*], rejection in the [OTA] evaluation phase did disqualify [a bidder] from consideration for the follow-on production contract contemplated by the [OTA]." *Id.* In *MD Helicopters Inc. v. United States*, the district court dismissed an APA claim against the Army for an OTA prototype project because the OTA "took place within the 'process of determining a need for acquisition' of advanced helicopters." 435 F. Supp. 3d 1003, 1013 (D. Ariz. 2020). Distinguishing the case from *SpaceX*, the district court found the OTA included a down-select process that would eliminate vendors at the various stages, possibly resulting in the award of "a 'follow-on production contract or transaction *without the use of competitive procedures*' under 10 U.S.C. § [4022](f) to [p]erformers who successfully complete the prototype project." *Id.* (original emphasis). Both this court and the District of Arizona have held where an OTA can result in the exclusion of a bidder for consideration of "a follow-on production contract," the OTA is "in connection with a procurement or a proposed procurement." § 1491(b)(1); *Kinemetrics, Inc.*, 155 Fed. Cl. at 785; *MD Helicopters Inc.*, 435 F. Supp. 3d at 1013.

The government principally relies on three cases in its motion to dismiss, but each is distinguishable. Gov't MJAR at 15–16. In *Space Exploration Technologies Corp. v. United States*, this court found OTAs "are not procurement contracts," and the particular OTA in question was not in connection with a procurement. 144 Fed. Cl. 433, 442 (2019). The *SpaceX* court, unlike this case, relied on the particular OTA competition there: (1) was not for goods or services, and (2) the phase two procurement was predetermined to be a separate FAR-based

competition, fully open to those excluded from the OTA competition.  *Id.* at 443–45.  In *Resource Conservation Group, LLC v. United States*, the Federal Circuit stated:  "[section] 1491(b)(1) in its entirety is exclusively concerned with procurement solicitations and contracts." 597 F.3d 1238, 1245 (Fed. Cir. 2010).  That case involved the government solicitation of lessees for land it already owned, not OTAs or an agency acquisition, and the Circuit found this was not a part of the "process of acquiring property or services."  *Id.* at 1244 (citing *Distributed Sols., Inc.*, 539 F.3d 1340).  Finally, the Federal Circuit in *Hymas v. United States* found cooperative agreements do not fall under the Tucker Act but said nothing of OTAs or when an OTA is in connection with a proposed procurement.  810 F.3d 1312, 1330 (Fed. Cir. 2016).

The Court is unpersuaded by the government's arguments.[1]  The Federal Circuit has been direct on the Court of Federal Claims bid protest jurisdiction under the Tucker Act:  "the statute does not require an actual procurement" and "explicitly contemplates the ability to protest these kinds of pre-procurement decisions by vesting jurisdiction in the Court of Federal Claims over 'proposed procurements.'"  *Distributed Sols., Inc.*, 539 F.3d at 1346; *AgustaWestland*, 880 F.3d at 1330.  It is therefore immaterial whether the potential procurement of 150 AGPUs ever occurs, so long as the government has "initiated 'the process for determining a need' for acquisition," and that acquisition might occur via procurement.  *AgustaWestland*, 880 F.3d at 1330 (quoting *Distributed Sols., Inc.*, 539 F.3d at 1346).  The OTAs in this case "initiated 'the process for determining a need' for acquisition," *id.*, and they are "in connection with" that process because they may result in the exclusion of plaintiff for consideration of "a follow-on production contract."  *Distributed Sols., Inc.*, 539 F.3d at 1346; § 1491(b)(1); *see Kinemetrics, Inc.*, 155 Fed. Cl. at 785; *MD Helicopters Inc.*, 435 F. Supp. 3d at 1013.  Such activity fits squarely within the first "stage of the federal contracting acquisition process."  *Distributed Sols., Inc.*, 539 F.3d at 1346.  Therefore, the Court has subject matter jurisdiction over plaintiff's complaint and must deny the government's motion to dismiss.[2]

## IV.    Plaintiff's Motion to Supplement the Administrative Record

In support of its claim the Army waived or relaxed the modularity requirement in the RWP, plaintiff attached a declaration from Bahman Seifollahi to its complaint.  Am. Compl at 29; Seifollahi Decl., ECF No. 24-5.  Plaintiff submits the declaration from Mr. Seifollahi, the president of plaintiff Hydraulics, to prove "Sun Test and JBT could not meet the mandatory requirement of modular design in the PID."  Am. Compl. at 30; Pl.'s MJAR at 33.  In response to plaintiff's modularity arguments, the government suggests "this Court should strike the Declaration of Mr. Bahman Seifollahi and the portions of HII's MJAR that rely on that

---

[1] Although the government argues the Court having jurisdiction would "do[] violence to the intent of Congress and to . . . the language in [§ 4022(f)]," Tr. at 11:19–12:1, the DoD apparently is also unpersuaded.  *See* DoD, Other Transactions Guide ("OT Guide") (2018), at 37, https://www.dau.edu/pdfviewer/Source/Guidebooks/Other-Transactions-(OT)-Guide.pdf ("Myth 5:  OT[A]s cannot be protested. . . .  Protests to the U.S. Court of Federal Claims are . . . possible but are a rare occurrence."); *see also* Peters, *supra*, at 5 ("OT[A]s are not free from all legislative and regulatory requirements.  Generally, statutes and regulations that are not procurement-specific apply, including . . . the Tucker Act (28 U.S.C. [§] 1491)."); *Space Expl. Techs. Corp.*, 144 Fed. Cl. at 435 (citing OT Guide); *MD Helicopters Inc.*, 435 F. Supp. 3d at 1005 (citing Peters, *supra*, at 4).

[2] Plaintiff agreed its motion to transfer venue is moot if the Court determines it has jurisdiction over its complaint. Tr. at 68:5–7.  Accordingly, the Court denies as moot plaintiff's motion to transfer venue, ECF No. 30.

declaration entirely." Gov't MJAR at 27.  Spurred by the government's suggestion, plaintiff, in its reply-MJAR brief, moves to supplement the administrative record with the declaration.  Pl.'s Reply at 27.  Plaintiff contends "the [a]dministrative [r]ecord is devoid of any [g]overnment consideration or evaluation of the key PID modularity requirement[, so t]he [d]eclaration is necessary to a full and complete understanding of the modularity issue in the solicitation."  *Id.* According to plaintiff, "the [d]eclaration provides information on the aspects of modularity for Sun Test, JBT, and Hydraulics based on knowledge, experience, and perception, and is necessary so as not to frustrate effective judicial review because the Government should have but did not consider modularity in its evaluations."  *Id.* at 28.

The government argues plaintiff has not met the high bar required for supplementation. Gov't Reply at 16.  According to the government, "Mr. Seifollahi's opinions on modularity are simply irrelevant," and "[t]he Court may not substitute its own judgment for that of the Army on the technical merits of the whitepapers; it certainly may not substitute HII's."  *Id.* at 17.  The government asserts the administrative record is "amply sufficient to adjudicate HII's argument regarding modularity," and states "supplementing the administrative record with Mr. Seifollahi's opinions on modularity would be an abuse of discretion."  *Id.* at 18.

The Federal Circuit established the standard for supplementation of the administrative record in *Axiom Resource Management, Inc. v. United States*, 564 F.3d 1374 (Fed. Cir. 2009).  In *Axiom*, the Federal Circuit explained, "[t]he purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'"  *Axiom Res. Mgmt., Inc.*, 564 F.3d at 1380 (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)).  "Thus, supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'"  *Id.* (quoting *Murakami*, 46 Fed. Cl. at 735).  It is well settled that the 'primary focus' of the court's review of agency decision making 'should be the materials that were before the agency when it made its final decision.'"  *Joint Venture of Comint Sys. Corp. v. United States*, 100 Fed. Cl. 159, 166 (2011) (quoting *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345, 349–50 (1997)).  "[T]o perform an effective review pursuant to the [Administrative Procedure Act ('APA')], the court must have a record containing the information upon which the agency relied when it made its decision as well as any documentation revealing the agency's decision-making process." *Vanguard Recovery Assistance v. United States*, 99 Fed. Cl. 81, 92 (2011) (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).  Plaintiff agrees the declaration offered by Mr. Seifollahi "was not part of the materials that were before the agency" at the time of the whitepaper evaluation.  Tr. at 71:2–5.  Therefore, the only question for the Court to answer under *Axiom* is whether omission of the declaration would preclude effective judicial review.  564 F.3d at 1380.

Mr. Seifollahi's declaration states Sun Test and JBT could not meet the modularity requirement, which contradicts the whitepapers of both offerors.  Seifollahi Decl. at 3.  In its whitepaper, JBT asserts "[u]nmet requirements were identified and new subsystems integrated in order to completely comply with the PID."  AR at 303 (JBT Whitepaper).  JBT also specifically lists its compliance with the modularity requirement in its "Key Performance Parameters

Compliance Table." AR at 330, 339. Sun Test's whitepaper asserts full compliance with all PID requirements, "except as listed," and does not note modularity as a compliance exception; in other words, Sun Test's whitepaper certifies its prototype is modular. AR at 375–77 (Sun Test Whitepaper). As both Sun Test and JBT certified modularity compliance, the government was entitled to rely on those assertions when considering the bids. *See Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1330 (Fed. Cir. 2011) ("Where an offeror has certified that it meets the technical requirements of a proposal, the Contracting Officer is entitled to rely on such certification in determining whether to accept a bid . . . ."). Mr. Seifollahi's declaration, thus, offers nothing to the record but a contradiction to these bidders' whitepaper certifications. Seifollahi Decl. at 3. To take such contradictory statements over the technical evaluations conducted by the Army in accepting these bids would "convert the 'arbitrary and capricious' standard into effectively de novo review." *Axiom Res. Mgmt., Inc.*, 564 F.3d at 1380 (quoting *Murakami*, 46 Fed. Cl. at 735).

Assuming Mr. Seifollahi's declaration is correct, supplementation would still be inappropriate. An offeror's potential failure to comply with the proposal requirements is ordinarily "a matter of contract administration," which does not go to the propriety of accepting the bid. *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1039 (Fed. Cir. 2009) (citation omitted). "However, where a proposal, *on its face,* should lead an agency to the conclusion that an offeror could not and would not comply with the [applicable requirement], we have considered this to be a matter of the proposal's technical acceptability," which does affect the propriety of accepting the offer. *Id.* (citation omitted and emphasis added). Although Mr. Seifollahi's declaration may submit Sun Test's and JBT's whitepapers improperly certified modularity, "documents [that] proffer facts that substitute plaintiff's opinion for the [agency's] technical determinations" "are not proper supplementation of the administrative record." *RhinoCorps Co. v. United States*, 87 Fed. Cl. 261, 282 (2009); *accord PlanetSpace, Inc. v. United States*, 90 Fed. Cl. 1, 6 (2009) (A "declaration [] devoted entirely to re-arguing the merits of [the agency's] award decision" is "prototypical of the kind of extra-record evidence against which the court must guard."). To that end, it is unclear how Mr. Seifollahi purports to know Sun Test and JBT could not meet the modularity requirement, as he readily admits "[he] do[es] not know what exact unit Sun Test or JBT indicated would be provided in their [w]hitepapers and [he] understand[s] that information is protected." Seifollahi Decl. at 3.

Plaintiff's motion to supplement the administrative record seeks to introduce "new evidence [and] 'convert the "arbitrary and capricious" standard into effectively de novo review.'" *Axiom Res. Mgmt., Inc.*, 564 F.3d at 1380 (quoting *Murakami*, 46 Fed. Cl. at 735). This is precisely the form of supplementation *Axiom* warns against, and plaintiff does not disagree. *See* Tr. at 78:21–79:10 ("THE COURT: . . . [Y]ou agree [Mr. Seifollahi's declaration is] a technical review[,] a complex technical analysis . . . [c]orrect? [PLAINTIFF]: Yes. THE COURT: Okay. Again, *Axiom* says, 'The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to convert to de novo review.' Isn't that exactly what *Axiom* suggests we guard against? [PLAINTIFF]: When you put it that way, I would say I think you have a good point."). As the Sun Test and JBT whitepapers both certify modularity compliance, and the Army was "entitled to rely on such certification[s] in determining whether to accept [the] bid[s]," Mr. Seifollahi's contrary declaration would not aid

judicial review. *Allied Tech. Grp., Inc.*, 649 F.3d at 1330. Accordingly, the Court denies plaintiff's motion to supplement the administrative record.

## V.      The Cross-Motions for Judgement on the Administrative Record

Plaintiff and the government filed cross-motions for judgment on the administrative record. Plaintiff claims the Army misevaluated its proposal by ignoring its alternative pricing for a modified compliant unit and by inaccurately construing its proposed schedule. Pl.'s MJAR at 4. Plaintiff also alleges the Army inappropriately waived or relaxed the modularity requirement when evaluating the proposals from Sun Test and JBT. *Id.* As a result of the misevaluation of its own proposal, and the relaxed evaluation of the awardees' proposals, plaintiff argues the Army's actions and award decision were irrational, arbitrary and capricious, and in violation of law. *Id.* The government disagrees with plaintiff on each count, arguing the Army accurately evaluated each proposal, did not waive or relax the modularity requirement, and rationally selected Sun Test and JBT for award. Gov't MJAR at 19–33.

### A.      Standard of Review

When this Court evaluates a bid protest, "the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013); *see also Sys. Application & Techs., Inc., v. United States*, 100 Fed. Cl. 687, 711 (2011), *aff'd,* 691 F.3d 1374 (Fed. Cir. 2012). Arbitrary and capricious means "the agency entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (cleaned up).

"[T]he disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Allied Tech. Grp., Inc.*, 649 F.3d at 1326 (citation omitted). The Court has a narrow scope of review of agency judgements, particularly those involving subject-matter experts evaluating the technical merits of a proposal. *Tech. Innovation All. LLC v. United States*, 149 Fed. Cl. 105, 129 (2020). "[T]he Court should not substitute its judgment to assess the relative merits of competing proposals." *Walden Sec. v. United States*, 136 Fed. Cl. 216, 231 (2018) (citation omitted).

"[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). To establish prejudice, the protestor "must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." *Id*. This requirement is satisfied when "but for the government's alleged error, the protestor would have been 'within the zone of active consideration.'" *Preferred Sys. Sols., Inc. v. United States*, 110 Fed. Cl. 48, 57 (2013) (quoting *Allied Tech. Grp., Inc. v. United States*, 94 Fed. Cl. 16, 37 (2010)). "[T]here is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision. The protestor

must show prejudice under the usual standard. . . .  [T]here is no starting point of presumed prejudice." *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021).

### B.        Whether the Army's Evaluation of Plaintiff's Proposal was Rational

Plaintiff argues the government misevaluated their schedule and price regarding the production of an initial prototype unit.  Pl.'s MJAR at 25–29.  According to plaintiff, this misevaluation is demonstrated by language in the initial evaluation documents and a table within the selection memorandum.  *Id.*  Plaintiff does not challenge the evaluation of its proposal on any other grounds.  Tr. at 113:9–12 (when asked by the Court if the price and schedule issue were the only grounds for misevaluation of plaintiff's proposal, plaintiff's counsel stated:  "if the schedule and price were—if they truly were evaluated . . . [plaintiff] do[es]n't have another argument besides those two").

Plaintiff's whitepaper was unique from other proposals—plaintiff's current commercial unit does not meet the minimum requirement for the simultaneous operation of hydraulic, pneumatic, and AC power output.  *See* AR at 567 (Consensus Evaluation) ("[A] serious weakness is that the currently manufactured units do not meet the critical requirement of simultaneous operations.").  As such, plaintiff included two options within its whitepaper submission:  one option for a unit that does not meet the simultaneous operation requirement, and a second option for a heavily modified unit which does meet the simultaneous operation requirement.  *See* AR at 434 (Plaintiff's Proposal).  Plaintiff proposed different schedules and prices for each.  *Id.*

For the non-compliant option, "The period of performance from contract award to delivery of a prototype unit, for Risk Reduction Testing (RRT) . . . will be 9 months."  AR at 436 (Plaintiff's Proposal).  For the compliant option, "The period of performance from contract award to delivery of a prototype unit, for Risk Reduction Testing, that fully complies with the existing Draft PID, that includes simultaneous power operation, will be 12 months."  *Id.*

In addition to the "period of performance" outlined above, plaintiff's whitepaper also provided a "Proposed Schedule" based on the schedule required by the ORD.  *Id.*  The schedule provided in the ORD is as follows:

> Base Effort:
> 3QTR FY21 White Paper review/Select up to two vendors
> 1QTR FY22 Complete Risk Reduction Testing, Select one vendor

AR at 196 (ORD). The schedule provided by plaintiff's whitepaper is as follows:

> Base Effort:
> 2QTR FY21 Submittal of Enhanced White Paper (AGPU 1.1)
> 2QTR FY21 Government Review and Selection of HII for the Base Effort
> 1QTR–2QTR FY22 Delivery of RRT AGPU 1.1 Unit to the Government
> 2QTR FY22–4QTR FY22 RRT Test Phase

AR at 436 (Plaintiff's Proposal).  Significantly, plaintiff's proposed schedule assumed a base effort selection date a quarter sooner than the ORD contemplated.

As for pricing, for the non-compliant option, plaintiff's whitepaper proposed a base effort price of [XX] ([XX] with cost share) and an additional [XX] to complete the option effort.  AR at 437–38.  For the compliant option, plaintiff's whitepaper proposed a base effort price of [XX] ([XX] with cost share) and an additional [XX] to complete the option effort.  *Id.*

### 1.    Whether the Army Erred When Evaluating Plaintiff's Schedule in the Consensus Evaluation

The consensus evaluation states plaintiff "laid out a mitigation plan to design, develop, test, and provide a system capable of simultaneous operations, but it would add an additional 12 months to their schedule in order to prepare a prototype unit for RRT that meets" full compliance.  AR at 569 (Consensus Evaluation), 588 (Competitive Evaluation).  According to plaintiff, this demonstrates a misevaluation of the timeline proposed by plaintiff's whitepaper as the statement suggests a fully compliant prototype would require an additional twelve months when compared to the non-compliant option.  Pl.'s MJAR at 29.  Under plaintiff's proposal, production of the non-compliant alternative would take nine months, and production of the compliant alternative would take twelve months, so plaintiff asserts a correct understanding of their timeline would characterize the compliant alternative as requiring only an additional three months.  *Id.*  Plaintiff argues "the competitive process was not carried out to the maximum extent practicable, and [plaintiff] was harmed because its [w]hitepaper was not evaluated correctly as required by evaluation criteria."  Pl.'s MJAR at 30.

Further review of the consensus evaluation reveals other statements demonstrating plaintiff's proposal was not misevaluated.  The "Schedule" section of the consensus evaluation states "[t]he offeror's schedule will require 12 months to develop, integrate, and test a solution to meet the PID requirement for simultaneous operations."  AR at 568.  Within this section, the Army accurately represents plaintiff's proposed timeline, and the evaluation of that timeline states the "schedule is undesirable within the required timeline."  *Id.*; Tr. 95:18–23 ("THE COURT: . . . [T]he Army described this kind of a timeline as undesirable[?]  [PLAINTIFF]: Yes.  THE COURT:  And that's reasonable, right?  [PLAINTIFF]:  Well, they know their . . . minimum needs, yes.").  This language is consistent with the timeline provided by plaintiff and indicates the Army accurately construed the schedule when developing the consensus evaluation and other evaluation documents.  *Compare* AR at 436 (Plaintiff's Proposal), *with* AR at 568 (Consensus Evaluation).  Moreover, it demonstrates any weaknesses assessed because of plaintiff's schedule did not result from an incorrect comparison of two different proposed timelines, or that "the agency entirely failed to consider an important aspect of the problem."  *Ala. Aircraft Indus.*, 586 F.3d at 1375.

Furthermore, the "Risk and Mitigation" section of the consensus evaluation contains language which accurately reflects the timeline proposed by plaintiff.  AR at 567 (". . . HII has stated that they will require at least 12 months before a unit will be available for RRT. Therefore, the offeror cannot satisfy the requirements for simultaneous operation without significant technical, cost, and schedule risk.").  The "Test/Evaluation" section of the consensus

evaluation also contains language referencing the proposed schedule. AR at 568. The section states "HII will provide one prototype unit for RRT in 2nd QTR FY22." *Id.* Compared to plaintiff's proposal, plaintiff's whitepaper calls for a "1QTR–2QTR FY22 Delivery of RRT AGPU 1.1 Unit to the Government." AR at 436. Plaintiff's proposed delivery schedule applies to both the non-compliant and compliant options provided by plaintiff. *Id.* Given the 3-month differential in lead time between the two options, Pl.'s MJAR at 29, the schedule indicates a non-compliant option would be delivered in 1QTR FY22 and a compliant option in 2QTR FY22. *Id.* At oral argument, plaintiff confirmed that is how to read its proposed schedule. Tr. at 94:18–22. Since the Army refused to consider the non-compliant unit, the schedule contemplated in the "Test/Evaluation" section—2QTR FY22—is consistent with the 2QTR FY22 delivery date proposed by plaintiff. *Id.*; AR at 436, 568.

Despite the multiple examples in the consensus evaluation which demonstrate the Army accurately conceptualized plaintiff's timeline, plaintiff seizes on the "additional 12 months" language in the "Rationale" section to argue the Army misunderstood the proposed timeline. AR at 569. Based on the Court's review of the evaluation documents, however, the "additional 12 months" language from the "Rationale" section of the consensus evaluation refers to the initial time period the Army would have to wait before beginning risk reduction testing, if plaintiff's compliant unit was selected for award. *Id.* Before describing the proposed timeline offered by plaintiff, the evaluation rejects plaintiff's offer to provide a non-compliant unit. *Id.* ("HII recommended that the Government remove this key critical requirement for simultaneous operation. . . . [T]his requirement is still valid, posing a significant impact to HII's proposed solution."). Given the Army rejected the non-compliant alternative, any discussion of timeline would be in reference to the lead-time from the initial contract award, not a comparison to an unsuitable alternative. The "additional 12 months" therefore corresponds to the "period of performance from contract award to delivery of a prototype unit" which, according to plaintiff's whitepaper, "will be 12 months." AR at 436 (Plaintiff's Proposal). Noting the twelve months required for plaintiff to deliver a compliant prototype is consistent with the "competitive" nature of the evaluation considering other offerors, such as Sun Test and JBT, did not require the same lead time. *See* AR at 559 (JBT Consensus Evaluation noting their prototype delivery schedule is "1st QTR FY22"); 564 (Sun Test Consensus Evaluation noting the same). Furthermore, noting the twelve-month requirement is particularly salient as the schedule provided by plaintiff contemplates a risk reduction test phase finishing in 4QTR FY22 as opposed to the 1QTR FY22 end date identified by the ORD. *See* AR at 196 (ORD); AR at 436 (Plaintiff's Proposal).

Putting the Army's evaluation aside, plaintiff's proposed schedule on its face fails to meet the RWP scheduling requirements. The ORD schedule calls for selection of vendors in 3QTR FY21 and completion of risk reduction testing in 1QTR FY22. AR at 196. Applying plaintiff's proposed twelve-month lead time for delivery of a compliant prototype would mean risk reduction testing could begin no sooner than 3QTR FY22. This is a six-month delay when compared to the ORD schedule. *Id.* In the alternative, had the Army ignored the lead time language from plaintiff's proposal and instead relied exclusively on the schedule provided by plaintiff, delivery timing would remain an issue. *See id.*; AR at 436 (Plaintiff's Proposal). The earliest risk reduction testing window contemplated by plaintiff's whitepaper is 2QTR FY22 which is after the ORD anticipates completion of such testing. AR at 196 (ORD); AR at 436 (Plaintiff's Proposal). As such, assuming *arguendo* the consensus evaluation did misconstrue the

timeline proposed by plaintiff's whitepaper, plaintiff cannot prevail as "the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp.* 78 F.3d at 1562. Plaintiff's proposed interpretation of their delivery timeline still falls outside the schedule required by the ORD and therefore plaintiff cannot establish, "had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." *Id.* Plaintiff admitted as much in oral argument:

> THE COURT: . . . [Y]ou proposed 12 months for a compliant prototype and the ORD only allows for 6 months or 2 quarters.
> [PLAINTIFF]: Yes.
> THE COURT: [E]xplain that.
> [PLAINTIFF]: . . . [W]e were definitely going to need more time to have the simultaneous, yes.
> THE COURT: Okay. And then the Army described this kind of a timeline as undesirable[?]
> [PLAINTIFF]: Yes.
> THE COURT: And that's reasonable, right?
> [PLAINTIFF]: Well, . . . they know their minimum needs, yes.

Tr. at 95:10–23.

The AR demonstrates a thorough review of plaintiff's whitepaper with respect to scheduling; the Court is unpersuaded by plaintiff's arguments to the contrary. Plaintiff has not shown the Army relied on inaccurate information when preparing the evaluation documents or that their proposal was subject to a less scrutinizing review than that of other participants. As such, the Court does not find "[t]he competitive process was not carried out to the maximum extent practicable." Pl.'s MJAR at 30; *see SMS Data Prod. Grp., Inc. v. United States*, 853 F.2d 1547, 1553–54 (Fed. Cir. 1988). Furthermore, the Court does not find the evaluation of plaintiff's timeline, as outlined in the consensus evaluation, to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Glenn Def. Marine*, 720 F.3d at 907. As demonstrated by three separate sections in the consensus evaluation, the Army evaluated the schedule consistent with the timeline advocated for by plaintiff and did not "entirely fail[] to consider an important aspect of the problem." *Ala. Aircraft Indus.*, 586 F.3d at 1375. The decision to note the twelve-month lead time in reference to the contract award, as opposed to non-compliant alternative, is not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* Even if the Army had incorrectly evaluated plaintiff's proposed schedule, plaintiff fails to show prejudice. *Data Gen. Corp.*, 78 F.3d at 1562. Plaintiff's proposed schedule, construed in plaintiff's favor, fails to meet the minimum requirements set forth in the ORD and therefore there was not a "reasonable likelihood that the protester would have been awarded the contract." *Id.* Plaintiff fails to meet the "heavy burden of showing that the award decision had no rational basis." *Allied Tech. Grp., Inc.*, 649 F.3d at 1326.

## 2. Whether the Army Erred When Evaluating Plaintiff's Schedule in the Selection Memorandum

Plaintiff argues, separate from the alleged misevaluation in the consensus evaluation, its proposed schedule was also misevaluated in the selection memorandum.  Pl.'s MJAR at 26–29.  The selection memorandum includes a table which summarizes the primary information, such as initial technical rating, company name, cost, and period of performance, for each company which submitted a whitepaper.  *Id.* at 26.  According to plaintiff, their whitepaper identifies a total "period of performance" of twenty-seven months, inclusive of both the base effort and option effort.  *Id.*  The table, however, indicates a "period of performance" of nine months for plaintiff's proposal.  AR at 669 (Selection Memorandum).  Plaintiff states other information in this table correctly matches the whitepaper information provided by Sun Test and JBT, but incorrectly represents plaintiff's proposal information.  Pl.'s MJAR at 26.  Plaintiff contends this shows the Army relied on accurate information for other bidders, but inaccurate information for plaintiff's proposal, and therefore "the agency conducted a disparate and unequal competitive evaluation."  *Id.*

As an initial matter, plaintiff fails to divulge the information included in the table was auto-populated directly from information provided by plaintiff during the whitepaper submission process.  *See supra* Section I.B; AR at 8–9 (RWP).  As such, plaintiff complains that the government inappropriately relied on information plaintiff directly provided.  Such reliance is per se reasonable as an agency "is entitled to rely on [an offeror's certification] in determining whether to accept a bid, and the offeror's potential failure to comply with the proposal requirements is ordinarily 'a matter of contract administration,' which does not go to the propriety of accepting the bid."  *Allied Tech. Grp.*, 649 F.3d at 1330 (citing *Centech Grp., Inc.*, 554 F.3d 1029).

Plaintiff argues the auto-population from the self-reported information is immaterial because "[t]he RWP states that the evaluations will be conducted based on the information submitted in the Whitepapers. . . .  [T]hat is the only place that the Government should have looked to evaluate [plaintiff's] proposal."  Pl.'s Reply at 18–19.  To succeed on this argument, plaintiff must demonstrate:  (1) the Army relied on the information in the table and not the information in its whitepaper; and (2) reliance on this information was prejudicial.  *See Data Gen. Corp.*, 78 F.3d at 1562 ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.").  Plaintiff does not, however, provide any evidence the government relied on the information in the table when drafting the selection memorandum.  Plaintiff cites no language from the selection memorandum which indicates the Army contemplated a nine-month timeline as opposed to a twenty-seven-month timeline.  Rather, plaintiff merely concludes "any evaluation was based on incorrect information as evidenced by the Government's own table in the Selection Memo" and "[plaintiff] specifically offered a solution with simultaneous operations with a competitive price and schedule that the Selection Memo documents [did] not consider[]."  Pl.'s MJAR at 26; Pl.'s Reply at 17.

Contrary to plaintiff's assertions, the selection memorandum indicates the Army relied on plaintiff's whitepaper and understood the various options provided, including the redesign for simultaneous operation.  AR at 672 (Selection Memorandum).  The selection memorandum states:  "The offeror is capable of providing a prototype unit that provides simultaneous electric,

hydraulic, and pneumatic power requirement; however, additional time for design, build and in-house testing will be required to integrate this required capability." *Id.* As discussed *supra* Section V.B.1., this "additional time" language represents the Army's understanding that plaintiff requires twelve months to deliver a compliant prototype. Plaintiff has therefore not demonstrated a significant error in the procurement process or shown evidence of a disparate and unequal evaluation. *See Data Gen. Corp.*, 78 F.3d at 1562. Instead, plaintiff is left to argue the mere existence of inaccurate information, which plaintiff directly provided, taints the entire award decision regardless of evidence indicating the government never relied on the inaccurate information. Such discrepancies are insufficient to invalidate an otherwise sound award decision. *See Gulf Grp. Inc. v. United States*, 61 Fed. Cl. 338, 358 (2004) (holding discrepancies in the record concerning the score of a prior evaluation was "of the variety of 'small or immaterial errors' that are not sufficient to invalidate a procurement decision") (citing *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955 (Fed. Cir. 1993)); *Ala. Aircraft Indus.*, 586 F.3d at 1375.

Even if the Army did rely on the information from the table instead of plaintiff's whitepaper, plaintiff has not demonstrated such reliance was prejudicial. *See Data Gen. Corp.*, 78 F.3d at 1562. The "period of performance" represented in the table is 18 months shorter than plaintiff's actual schedule, and is consequently the only representation of plaintiff's timeline which may, if viewed favorably, meet the schedule of the ORD. AR at 436 (Plaintiff's Proposal); AR at 196 (ORD). To establish prejudice, the protestor must show "but for the government's alleged error, the protestor would have been 'within the zone of active consideration.'" *Preferred Sys. Solutions, Inc*, 110 Fed. Cl. at 57 (quoting *Allied Tech. Grp., Inc.*, 94 Fed. Cl. at 37). Here, this burden is not carried because the alleged error does not move plaintiff outside the "zone of active consideration." *Id.* Rather, given the Army's frequently expressed concern regarding plaintiff's proposed schedule, the alleged error presumably would have moved plaintiff closer to the "zone of active consideration." *Id.* As discussed *supra* Section V.B.1., plaintiff's proposed whitepaper schedule on its face fails to meet the RWP scheduling requirements absent any selection memorandum errors. As such, plaintiff fails to meet the "heavy burden of showing that the award decision had no rational basis" and fails to show prejudice. *Allied Tech. Grp., Inc.*, 649 F.3d at 1326; *Data Gen. Corp.*, 78 F.3d at 1562.

### 3.   Whether the Army Erred When Evaluating Plaintiff's Price in the Consensus Evaluation

Plaintiff next contends "[t]he Government's obvious misunderstanding of Hydraulics schedule and pricing can also be seen in the evaluation documents." Pl.'s MJAR at 28. To support this argument, plaintiff quotes two initial technical evaluations: "HII states there will be an increased risk, both technically and cost-wise, if the simultaneous power requirement is maintained." *Id.* (quoting AR at 534, 549). Plaintiff also quotes from the consensus evaluation:

> HII states there will be an increased risk, both technically and cost-wise, if the simultaneous power requirement is maintained. . . . Therefore, the offeror cannot satisfy the requirement for simultaneous operation without significant technical, cost, and schedule risk. . . . Redesigning the unit is a cost risk as there will be additional cost per unit.

*Id.* (quoting AR at 567 (original alterations)).  Based on these two statements alone, plaintiff concludes:

> The evaluators did not realize and evaluate that [plaintiff] did include pricing for the base and option for a unit with simultaneous operations.  The information was specifically marked in the pricing tables in [plaintiff's] Whitepaper and the statements in . . . the evaluation documents expressing uncertainty about the cost risks is just not rational given the evidence in the Whitepaper concerning the cost of simultaneous operations for [plaintiff's] offer.

*Id.* at 29.

Contrary to plaintiff's conclusion, the statements quoted *supra* do not demonstrate the Army was unaware plaintiff's whitepaper contained an option for a compliant unit.  Rather, the statements merely identify pursuing the compliant option, as described in the whitepaper, would require accepting additional risk.  AR at 534, 549, 567.  Importantly, the Army did not assess these risks itself; plaintiff's own whitepaper warned of these specific risks if its compliant unit were selected for award.  *See* AR at 434 (Plaintiff's Proposal) ("[T]here will be an increased risk both technically and cost wise if the simultaneous power requirement is maintained.").

Plaintiff ignores numerous sections in both the initial technical evaluations and the consensus evaluation which demonstrate the Army was aware of both options provided in plaintiff's whitepaper.  One technical evaluation notes the existence of the compliant option in three different sections.  *See* AR at 533–34 (Initial Technical Evaluation).  Moreover, the consensus evaluation specifically indicates plaintiff did provide an option compliant with the simultaneous operation requirement.  AR at 566 (Consensus Evaluation), 586 (Competitive Evaluation) ("The offeror is capable of providing a prototype unit that provides simultaneous electric, hydraulic, and pneumatic power requirements").  If that were not enough, plaintiff agreed at oral argument the price information listed in the competitive evaluation, including both of plaintiff's prototype options, AR at 587, is "the correct information."  Tr. at 100:16–24.

Given multiple sections of the initial technical evaluations and the consensus evaluation demonstrate the Army's understanding of the options provided by plaintiff's whitepaper, plaintiff is unable to demonstrate "the agency entirely failed to consider an important aspect of the problem."  *Ala. Aircraft Indus.*, 586 F.3d at 1375.  Furthermore, the concerns regarding the risks of selecting plaintiff's compliant prototype option, which involves redesigning the system for simultaneous operation, are adopted directly from plaintiff's own whitepaper.  *See* AR at 434 (Plaintiff's Proposal).  The explanation for these concerns, therefore, do not run "counter to the evidence before the agency."  *Ala. Aircraft Indus.*, 586 F.3d at 1375.  Instead, the explanation comes directly from the evidence put before the agency by plaintiff itself.  Even if plaintiff had not suggested these concerns directly, such an evaluation is directly contemplated by the ORD which permits the Army to consider the "[e]xtent to which the cost/price estimate provided is appropriate for the proposed scope or approach."  AR at 11–12.  The Court must give deference to agency evaluations concerning technical, subject-matter decisions.  *Tech. Innovation All. LLC*, 149 Fed. Cl. at 129.  The Army is tasked with evaluating the risks associated with prototype

- 21 -

production, and, in this case, it chose to adopt the view expressed directly by plaintiff.  This decision is not so implausible "that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus.*, 586 F.3d at 1375.  As such, plaintiff fails to meet the "heavy burden of showing that the award decision had no rational basis." *Allied Tech. Grp., Inc.*, 649 F.3d at 1326.

### 4.    Whether the Army Erred When Evaluating Plaintiff's Price in the Selection Memorandum

Plaintiff also argues its proposed price was incorrectly evaluated in the selection memorandum.  Pl.'s MJAR at 26.  Plaintiff's arguments on this front mirror its arguments related to the incorrect schedule data in the table included in the selection memorandum.  *See supra* Section V.B.2.  According to plaintiff, their whitepaper identifies a total price of [XX] ([XX] with cost share), inclusive of both the base effort and option effort.  *Id.*  The table, however, indicates an "Estimated Cost" of [XX] for plaintiff's proposal.  AR at 669 (Selection Memorandum).  According to plaintiff, the information in this table correctly matches the whitepaper information provided by the other bidders but includes incorrect information for plaintiff.  Pl.'s MJAR at 26.  Plaintiff concludes from this table that "the agency conducted a disparate and unequal competitive evaluation." *Id.*

Just as with the scheduling data, plaintiff fails to divulge the information included in the table was auto-populated directly from information provided by plaintiff during the whitepaper submission process.  *See supra* Section V.B.2.  As such, plaintiff complains the government inappropriately relied on information which plaintiff directly provided.  Such reliance is per se reasonable as an agency "is entitled to rely on [an offeror's certification] in determining whether to accept a bid, and the offeror's potential failure to comply with the proposal requirements is ordinarily 'a matter of contract administration,' which does not go to the propriety of accepting the bid." *Allied Tech. Grp.*, 649 F.3d at 1330 (citing *Centech Grp., Inc.*, 554 F.3d 1029).

Plaintiff argues the auto-population from self-reported information is immaterial because "[t]he RWP states that the evaluations will be conducted based on the information submitted in the Whitepapers. . . .  [T]hat is the only place that the Government should have looked to evaluate [plaintiff's] proposal." Pl.'s Reply at 18–19.  To succeed on this argument, plaintiff must demonstrate:  (1) the Army relied on the information in the table and not the information in plaintiff's whitepaper; and (2) reliance on this information was prejudicial.  *See Data Gen. Corp.*, 78 F.3d at 1562 ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.").  Plaintiff does not, however, provide any evidence the government relied on the information in the table when drafting the selection memorandum.  *See* Pl.'s MJAR 24–29; Pl.'s Reply 17–20.  Plaintiff cites no language from the selection memorandum which indicates contemplation of a [XX] total cost as opposed to an [XX] total cost.  Rather, plaintiff merely concludes "any evaluation was based on incorrect information as evidenced by the Government's own table in the Selection Memo" and "[plaintiff] specifically offered a solution with simultaneous operations with a competitive price and schedule that the Selection Memo documents [did] not consider[]." Pl.'s MJAR at 26; Pl.'s Reply at 17.

Contrary to plaintiff's assertions, the selection memorandum indicates the Army relied on plaintiff's whitepaper and understood the pricing provided.  AR at 672 (Selection Memorandum).  The selection memorandum states:  "The estimated cost does not include additional pricing associated with the redesign of the prototype to meet the Critical Requirement for simultaneous operation."  *Id.*  The "estimated cost" refers to the specific table heading and the associated [XX] figure provided in the selection memorandum table.  AR at 669.  The language thus distinguishes the cost provided in the table and the cost provided by plaintiff's whitepaper by indicating the "estimated cost" from the table does not encompass the full scope of plaintiff's proposal described in its whitepaper.  This language directly counters plaintiff's assertion, as it demonstrates the Army understood the data in the table to not cover plaintiff's full proposal.  Plaintiff has therefore not demonstrated a significant error in the procurement process or shown evidence of a disparate and unequal evaluation.  *See Data Gen. Corp.*, 78 F.3d at 1562.  Again, plaintiff is left to argue the mere existence of inaccurate information, which it directly provided, taints the entire evaluation regardless of evidence indicating the Army understood the data to be incomplete.  Such an inconsistency does not rise to a level sufficient to invalidate an otherwise sound award decision.  *See Gulf Grp. Inc.*, 61 Fed. Cl. at 358 (citing *Lockheed Missiles & Space Co.*, 4 F.3d 955) (holding that discrepancies in the record concerning the score of a prior evaluation was "of the variety of 'small or immaterial errors' that are not sufficient to invalidate a procurement decision").  As such, plaintiff fails to meet the "heavy burden of showing that the award decision had no rational basis."  *Allied Tech. Grp., Inc.*, 649 F.3d at 1326.

### C.     Whether the Army Waived or Relaxed the Modularity Requirement

Plaintiff also argues the Army inappropriately "waived or relaxed" the requirement the system be modular for Sun Test and JBT, but not for others.  Pl.'s Reply at 20–22.  Plaintiff claims "the evaluation of Sun Test and JBT was flawed since they could not meet and comply with the requirement in the ORD for modular design which comes from the PID at 3.8 and 3.17."  Pl's Reply at 21.  To support its contention the Sun Test and JBT proposals did not meet the modularity requirement, plaintiff relies on the declaration of Bahman Seifollahi—president of the plaintiff-company.  Pl.'s Reply at 22.  The Court denied plaintiff's motion to supplement the administrative record with this declaration, *supra* Section IV, so plaintiff is left with its bare disagreements with Sun Test's and JBT's whitepapers, and the Army's evaluations thereof.  *See* Pl.'s MJAR at 33, Pl.'s Reply at 22 (basing its modularity claim solely on the declaration of Bahman Seifollahi); *see also RhinoCorps Co.*, 87 Fed. Cl. at 282 ("[D]ocuments [that] proffer facts that substitute plaintiff's opinion for the [agency's] technical determinations" "are not proper supplementation of the administrative record.").  Plaintiff argues:  (1) "[t]he statements in the submissions from JBT and Sun Test are insufficient in that they do not match the specific language seen in the ORD or the PID," Pl.'s MJAR at 33; and (2) "modularity is not mentioned in any of the evaluation documents for Sun Test, JBT, or [plaintiff] in the Administrative Record," so the requirement must have been waived, Pl.'s Reply at 22.

The government responds it determined the Sun Test and JBT proposals did meet the modularity requirement, and the "'highly deferential' 'rational basis' standard of review does not allow the Court to substitute [plaintiff's] opinions regarding other companies' technology in place of Sun Test's, JBT's, and the Army's unanimously contrary view."  Gov't Reply at 16

(quoting *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018)). The government also identifies language in both the JBT and Sun Test whitepapers which assert compliance with the modularity requirement. Gov't MJAR at 25. The government argues plaintiff ignores language in the JBT and Sun Test proposals which contemplates changes to their commercial offerings to meet full compliance. *Id.* at 25–26. "The evaluation comments did not specifically mention modularity," but "[t]he arbitrary and capricious standard does not—and for the sake of readability and comprehension, cannot—require rote recitation of every requirement in the evaluations." *Id.* at 26–27.

"The Court's scope of review is particularly narrow when it comes to agency judgments regarding the technical merits of particular proposals." *Tech. Innovation All. LLC*, 149 Fed. Cl. at 129. Where an agency's action was reasonably based, "the Court cannot substitute its judgment for that of the agency." *RX Joint Venture, LLC v. United States*, 145 Fed. Cl. 207, 213 (2019). "[I]t is well established that evaluations of proposals for their technical quality involves the specialized expertise of an agency's subject-matter experts," and thus, "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *RX Joint Venture*, 145 Fed. Cl. at 213 (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed Cir. 1996)).

The RWP required AGPU prototypes be "modular in design to facilitate rapid and effective repair." AR at 87 (ORD). The "modular components/subcomponents will be able to work independently from each other," and "modularity is defined as a variety of single components that are operated by a common power source." AR at 213. Sun Test's whitepaper states its system "is fully compliant . . . except as listed below." AR at 376. The modularity requirement is not a noted exception in this section, suggesting that Sun Test "is fully compliant" with that requirement. AR at 376–77. JBT's whitepaper states "[u]nmet requirements were identified and new subsystems integrated in order to completely comply with the PID." AR at 303. JBT's whitepaper includes a table which identifies the modularity requirement twice, and in both instances, it states JBT's prototype will "[c]omply." AR at 339, 341. JBT's whitepaper also includes a diagram showing its system as "a variety of single components that are operated by a common power source." AR at 300, 339. The Army reviewed these submissions and determined Sun Test's and JBT's "system[s] fully meet[] all requirements." AR at 580, 583.

Plaintiff does not identify a single statement in either Sun Test's or JBT's whitepaper indicating either bidder would not comply with the modularity requirement. Rather, plaintiff contends the instances where Sun Test and JBT certify compliance with the modularity requirement are insufficient for not repeating the verbatim language of the RWP. Pl.'s MJAR at 33. In reviewing Sun Test's and JBT's whitepapers, the Army found the language used in the whitepapers sufficient to conclude Sun Test's and JBT's "system[s] fully meet[] all requirements." AR at 580, 583. Given "[t]he Court's scope of review is particularly narrow when it comes to agency judgments regarding the technical merits of particular proposals," *Tech. Innovation All. LLC*, 149 Fed. Cl. at 129, the Court is unable to substitute its judgment for that of the government. *RX Joint Venture, LLC*, 145 Fed. Cl. at 213. The modularity requirement is an issue involving evaluations of proposals for their technical qualities, and thus, these evaluations should be left to the subject matter experts at the Army. *Id.* The evidence in the administrative record shows Sun Test and JBT complied with the modularity requirement, so the Court must

defer to the government's judgment on this issue. *See CSC Gov't Sols. LLC v. United States*, 129 Fed. Cl. 416, 434 (2016) (explaining great deference must be afforded to an agency's judgment "because of the highly specialized, detailed, and discretionary analyses frequently conducted by the government in that regard".). Further, Sun Test and JBT both certified their compliance with this requirement, and an agency "is entitled to rely on [an offeror's certification] in determining whether to accept a bid, and the offeror's potential failure to comply with the proposal requirements is ordinarily 'a matter of contract administration,' which does not go to the propriety of accepting the bid." *Allied Tech. Grp.*, 649 F.3d at 1330 (citing *Centech Grp., Inc.*, 554 F.3d 1029). Thus, even if plaintiff were correct in that neither proposal is modular, that would not affect the Court's review, as the Army is entitled to rely on the contrary whitepaper assertions. *Id.* As such, plaintiff fails to show the government waived or relaxed the modularity requirement for Sun Test and JBT, and therefore does not meet the "heavy burden of showing that the award decision had no rational basis." *Id.* at 1326.

### D.    Whether the Army's Best-Value Determination was Rational

Plaintiff's argument the Army's best-value determination was arbitrary and capricious is based only on its position the Army misevaluated plaintiff's price and schedule proposal and waived or relaxed the modularity requirement. Pl.'s MJAR at 35–37. At oral argument, plaintiff confirmed it has no other arguments pertaining to the rationality of the best-value determination if the Court were to find the Army's evaluations of price, schedule, and modularity had a rational basis. Tr. at 112:23–113:12. As discussed *supra* Sections V.B.1.–4., plaintiff fails to demonstrate the Army erred in its evaluation of plaintiff's price or schedule. Plaintiff also fails to demonstrate the Army waived or relaxed the modularity requirement when evaluating the whitepapers of Sun Test and JBT. *See supra* Section V.C. Given plaintiff has failed to carry its burden on these grounds, plaintiff's claim that the Army's best-value decision was arbitrary and capricious must likewise fail as necessarily dependent on them, as agreed by plaintiff. Pl.'s MJAR at 35–37; Tr. at 112:23–113:12.

To that end, plaintiff's whitepaper contained more shortcomings that were independently fatal to plaintiff's bid. Plaintiff's whitepaper admits "there will be an increased risk both technically and cost wise if the simultaneous power requirement is maintained." AR at 434 (Plaintiff's Whitepaper). As for technical risk, plaintiff's whitepaper stated: "[XXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXX]." *Id.* Either option under plaintiff's proposal would be problematic as there are "[XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX]." *Id.* In either case, plaintiff's whitepaper suggests "[a]dditional time for design, build and in-house testing will be required." *Id.* At oral argument, plaintiff agreed it was rational for the Army to consider plaintiff's numerous warnings as a weakness, and agreed the warnings were "significantly different than the other two proposals." Tr. at 113:13–114:5. The Army took plaintiff at its word and found plaintiff's whitepaper did not present the best value based on the risks identified in plaintiff's own whitepaper. *See* AR at 672 (Selection Memorandum) ("Redesigning the system to include simultaneous operation is a major effort and will increase technical, cost, and schedule risk."). As such, plaintiff was not awarded a base effort contract. AR at 675.

The Army's explanation for not awarding plaintiff the base effort accordingly does not run "counter to the evidence before the agency," as it is directly lifted from plaintiff's own submission. *Ala. Aircraft Indus.*, 586 F.3d at 1375. Given the Army's decision tracks admissions by plaintiff itself, the decision is not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* Plaintiff has therefore not carried its "heavy burden of showing that the award decision had no rational basis." *Allied Tech. Grp., Inc.*, 649 F.3d at 1326. As such, this Court will not "substitute its judgment to assess the relative merits of competing proposals" and must find the Army acted rationally when it chose not to award plaintiff the base effort or find it represented the best value. *RX Joint Venture*, 145 Fed. Cl. at 213.

## VI.    Plaintiff's Requests for Declaratory and Injunctive Relief

Plaintiff requests the Court "enter a declaratory judgement that: "(1) the evaluation of [plaintiff's] Whitepaper by Defendant United States, acting through its agent the United States Army in partnership with AMTC was irrational, arbitrary and capricious, an abuse of discretion, and otherwise a violation of law; [and] (2) that the Government should not be allowed to proceed with the prototype project to include the option of any follow-on production with Sun Test until such time as the Court can determine the propriety of the Government's actions." Pl.'s MJAR at 37. The Court does not find that the Army in partnership with AMTC acted irrationally, arbitrarily, capriciously, abused its discretion, or conducted their review in a manner which otherwise violated the law. *See supra* Section V. As such, the Court denies plaintiff's first requested declaratory judgement. Pl.'s MJAR at 37. Furthermore, because this Court does not find that the government acted irrationally with regards to the evaluation of the whitepapers or subsequent award, this Court denies plaintiff's second requested declaratory judgement. *Id.*

Plaintiff also requests "an Order from this Court enjoining the Agency from proceeding with the option with Sun Test." *Id.* at 38. The Court considers the following factors when determining whether to issue a permanent injunction: "(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). According to the first factor, plaintiff is not entitled to injunctive relief because plaintiff does not prevail on the merits. The Court therefore does not consider the remaining factors and denies plaintiff's request. *Info. Tech. & Apps. Corp. v. United States*, 51 Fed. Cl. 340, 357 n.32 (2001) ("Absent success on the merits, the other factors are irrelevant."), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003).

## VII.    Conclusion

For the foregoing reasons, the Court: (1) **DENIES** the government's motion to dismiss; (2) **DENIES as MOOT** plaintiff's motion to transfer venue; (3) **DENIES** plaintiff's motion to supplement the administrative record; (4) **DENIES** plaintiff's motion for judgment on the administrative record; and (5) **GRANTS** the government's motion for judgment on the administrative record. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge